UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE GIVOVICH, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION<br>SERVICES (USCIS), et al.,<br><br>        Defendants. | Case No. 24-cv-00848-HSG<br><br>**ORDER DENYING PLAINTIFFS'<br>MOTION FOR SUMMARY<br>JUDGMENT AND GRANTING<br>GOVERNMENT'S CROSS-MOTION<br>FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 20, 22 |

Pending before the Court are cross-motions for summary judgment.  Dkt. Nos. 20, 22.  The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted.  *See* Civil L.R. 7-1(b).  For the reasons detailed below, the Court **DENIES** Plaintiffs' motion for summary judgment and **GRANTS** Defendants' cross-motion.

## I.      BACKGROUND

### A.      Factual Background

Plaintiffs Nicole Givovich and Roberto Martinez Olivera seek judicial review of the decisions of the Board of Immigration Appeals ("BIA") and the United States Citizenship and Immigration Services ("USCIS") denying Plaintiff Martinez Olivera's I-130 petition to classify Plaintiff Givovich as the immediate relative spouse of a United States citizen.  *See* Dkt. No. 1 ("Compl.").  Givovich is a citizen of Chile, and entered the United States as a J-1 exchange visitor in August 2010.  *See* Dkt. No. 19-6 ("CAR4") at 453, 469.[1]  She has been married two times.  She married Doroteo Caldera Rodriguez, a lawful permanent resident of the United States, on

---

[1] The Certified Administrative Record ("CAR") is in four parts, and located at Dkt. Nos. 19-3, 19-4, 19-5, and 19-6, Ex. A.  The Court refers to the CAR's internal pagination unless otherwise specified.

November 13, 2010. *Id.* at 497. On December 7, 2010, Mr. Caldera Rodriguez filed a Form I-130, Petition for Alien Relative, on Givovich's behalf to classify her as a spouse of a legal permanent resident, which USCIS granted on May 12, 2011. *Id.* at 488. Givovich and Mr. Caldera Rodriguez divorced on October 2, 2012, which automatically revoked the Form I-130 petition. *Id.* at 479–83; 8 C.F.R. § 205.1(a)(3)(i)(D). Givovich married Plaintiff Roberto Martinez Olivera on October 9, 2012. *Id.* at 458. Martinez Olivera became a naturalized U.S. citizen on March 12, 2013. *Id.* at 456.

In October 2013, Plaintiff Martinez Olivera filed a Form I-130, Petition for Alien Relative, on Givovich's behalf, and Givovich correspondingly filed a Form I-485, Application to Register Permanent Residence or Adjust Status. *Id.* at 453–54; Dkt. No. 19-4 ("CAR2") at 12–20. After interviewing Givovich and Martinez Olivera regarding the petitions in January 2014, USCIS investigated the bona fides of Givovich's prior marriage with Mr. Caldera Rodriguez. *See* CAR2 at 79. On April 9, 2014, USCIS Immigration Officers interviewed Mr. Caldera Rodriguez, and he provided a written sworn statement (translated from Spanish to English) in which he stated that he had married Givovich "as a favor so she could obtain her legal residency." Dkt. No. 19-5 ("CAR3") at 342–44. Specifically, he explained that he and Givovich had met when they were taking English classes and were friends for about two years before getting married. *Id.* He said that Givovich had asked him to marry her to help her obtain her residency status. *Id.* Mr. Caldera Rodriguez stated that he and Givovich never lived together and were never intimate. *Id.*

In April 2015, USCIS issued a Notice of Intent to Deny ("NOID") the I-130 petition, which included the text of Mr. Caldera Rodriguez's statement. CAR4 at 446–48. Plaintiffs submitted a declaration and documentary evidence in response. *See* Dkt. CAR3 at 363–73; CAR4 at 373–445. In her declaration, Givovich contested the truth of Mr. Caldera Rodriguez's statement. CAR4 at 375. She explained that she had started dating Mr. Caldera Rodriguez around August 2010 to distract herself from her previous breakup from Plaintiff Martinez Olivera. *Id.* She said that by November 2010, she and Mr. Caldera Rodriguez had begun a sexual relationship. *Id.* at 376. She also said that it was Mr. Caldera Rodriguez's idea to get married in November 2010 on a gambling trip to Reno with friends, and that she ultimately agreed to the marriage to

move on from her past relationship with Plaintiff Martinez Olivera. *Id.* at 377. She said that after getting married, she returned to her house in Angwin, CA, and that Mr. Caldera Rodriguez would stay there at times. *Id.* at 378. In January 2011, she claimed that she moved in with Mr. Caldera Rodriguez in the room he rented from his aunt Bertha Munoz at 1123 Oak Avenue in St. Helena, CA ("the St. Helena address") in January 2011. *Id.* at 378. She described that soon after moving in, she began to feel "miserable" in her marriage. *Id.* at 379. By July 2011, she had reconciled with Plaintiff Martinez Olivera, and by August 2011, she had moved in with him in his home in Napa. *Id.* The documentary evidence Plaintiffs submitted in response to the first NOID included various communications between Mr. Caldera Rodriguez and Givovich in March 2010 in 2012, 2013, and 2014, in which Mr. Caldera Rodriguez made purportedly flirtatious or sexual comments to Plaintiff Givovich. *Id.* at 393–408. Plaintiffs also submitted the following documents to support Givovich's claimed addresses during her marriage to Mr. Caldera Rodriguez:

- A Planned Parenthood intake form listing "Doroteo" as Plaintiff Givovich's husband and listing her address as the St. Helena, CA address of Mr. Caldera Rodriguez's aunt. *See* CAR4 at 391;

- An auto insurance policy and bank statement each addressed solely to Plaintiff Givovich at the St. Helena address. *See id.* at 410–23;

- An unsigned statement from Gene Tardiff, Plaintiff Givovich's friend, who stated that he drove Givovich to the St. Helena address on some occasions, and that she told him she was married to Mr. Caldera Rodriguez. *Id.* at 443.

Plaintiffs also requested an evidentiary hearing to confront and cross-examine Mr. Caldera Rodriguez. *See* CAR3 at 361.

USCIS officers obtained a second statement from Mr. Caldera Rodriguez in July 2016. *See* CAR3 344–56. Mr. Caldera Rodriguez again reiterated his statement that his marriage to Givovich was "a business arrangement" from the very beginning. *Id.* at 345. He further explained that Givovich initially offered to pay him for the false marriage, and that Givovich was aware that he had a girlfriend in Mexico during their marriage. *Id.* He admitted that he and Givovich once had an intimate encounter, but they did not have sex. *Id.* at 346. He also said that he "asked her to

3

have casual sex." *Id.* Regarding the St. Helena address, he confirmed that he lived there from 2007 or 2008 to January 2011, and that he rented the space with a male roommate named Pedro, but never lived there or anywhere else with Givovich. *Id.* at 345. Regarding the documents Plaintiffs provided as residential evidence, he explained that Givovich had opened a bank account at Wells Fargo to create an address history for immigration purposes, but he never used it or had access to it. *Id.* at 348. He was not aware of an auto insurance policy addressed to Givovich at the St. Helena address. *Id.* He did not notice that Givovich ever received mail at the St. Helena address but recalled that she had once asked him if she had received a letter there. *Id.* at 347.

USCIS then obtained statements from three additional individuals: 1) Zuly Trejo, the mother of Mr. Caldera Rodriguez's child, 2) Bertha Munoz, Mr. Caldera Rodriguez's aunt and former landlord, who also knew Givovich, and 3) Odilon Rojas, Ms. Munoz's partner. Ms. Trejo confirmed in a written statement that she had met and started dating Mr. Caldera Rodriguez in September 2010,[2] that he was living at the St. Helena address with a male roommate at the time, and that she had visited and spent the night at the St. Helena address on several occasions. CAR3 at 340. She also stated that Mr. Caldera Rodriguez confessed to her that his marriage to Givovich was fraudulent. *Id.* In her written statement, Ms. Munoz confirmed that she had rented her garage at the St. Helena address to Mr. Caldera Rodriguez and his roommate "Pedro." *Id.* at 358. She stated that Givovich had used the St. Helena address to receive mail, but that she did not have a key to the house. *Id.* at 357. She describing seeing Givovich "come and go" from the house "over the course of about 4 months," but could not confirm whether she had any clothes or furniture there. *Id.* at 358. She also stated that she learned Givovich and Mr. Caldera Rodriguez were married when Mr. Caldera Rodriguez was living with Ms. Trejo and their baby, and Givovich had come to her asking for help and showed her a piece of paper regarding immigration consequences for the marriage. *Id.* Finally, Mr. Rojas stated that he had previously lived at the St. Helena address and that to his knowledge Mr. Caldera Rodriguez had lived in the garage with a male roommate, and that he never recalled a woman living there. *Id.* at 359. But he did say that he had

---

[2] This was approximately two months before Mr. Caldera Rodriguez and Plaintiff Givovich got married.

United States District Court
Northern District of California

1    seen Givovich at the home on approximately two occasions.  *Id.*

2        In November 2017, USCIS issued a second NOID that included the additional statements.

3    *See* CAR3 at 328–59.  The NOID stated that USCIS had concluded that there was substantial and

4    probative evidence that Givovich's marriage to Mr. Caldera Rodriguez was fraudulent, and that

5    Plaintiffs' rebuttal evidence failed to show a bona fide marital relationship.  *Id.* at 334–35.  USCIS

6    gave Plaintiffs thirty days to produce additional rebuttal evidence.  *Id.* at 336.  They did so,

7    submitting additional declarations by Plaintiffs, as well as letters from Jamie Rodriguez Godinez,

8    a friend of Mr. Caldera Rodriguez, and Plaintiff Givovich's father.  *See* CAR3 at 259–327.

9    Plaintiff Martinez Olivera stated that he and Plaintiff Givovich dated in 2009, broke up in August

10   2010, and reconciled in July 2011.  *Id.* at 300–301.  Plaintiff Givovich's declaration stated that Mr.

11   Caldera Rodriguez was lying about never having sex with her, and that Ms. Munoz knew Ms.

12   Givovich was staying at the St. Helena address.  *Id.* at 305–306.  Mr. Godinez's letter stated that

13   he spent time with Givovich and Mr. Caldera Rodriguez in 2010 and 2011, and during that time

14   believed they were a couple and visited them "in St. Helena."  *Id.* at 310.  And finally, in his letter,

15   Plaintiff Givovich's father stated that he was aware of the marriage, "a relationship that was born

16   and came to marriage during a time when [his] daughter (Nicole) was going through a bad time

17   and she decided upon breaking up with her current husband."  *Id.* at 312.

18       USCIS issued a third NOID in March 2022, stating that Plaintiffs' additional rebuttal

19   evidence failed to overcome the previous finding of substantial and probative evidence of

20   marriage fraud.  *See* CAR2 at 230.  In response, Plaintiffs submitted the birth certificates of their

21   children, a mortgage statement for the couple's home that they owned together, a fictitious

22   business statement of the business they planned to open together, and a letter confirming Plaintiff

23   Givovich's employment in Napa as of May 2022.  *Id.* at 198–206.

24       USCIS ultimately denied the I-130 visa petition in April 2023.  *See* CAR2 at 126–65.

25   USCIS explained that the two sworn statements of Mr. Caldera Rodriguez, and the corroborating

26   statements of Ms. Trejo, Ms. Munoz, and Mr. Rojas, provided substantial and probative evidence

27   that Plaintiff Givovich had "entered into marriage with Mr. Caldera Rodriguez for the purpose of

28   evading immigration laws."  *Id.* at 142–43.  Further, "the evidence submitted after three NOIDs

1    [did] not indicate the contrary." *Id.* at 143.  Because it denied the visa petition, USCIS also denied

2    Givovich's I-485 adjustment of status application that same day.  *See id*. at 1–3.  Plaintiffs

3    appealed the denial of the I-130 petition to the BIA.  *See* CAR1 at 76.  The BIA adopted and

4    affirmed the USCIS decision.  *See id.* at 62–66.

5         **B.    Statutory Framework**

6         A United States citizen may file an I-130 petition with USCIS to obtain lawful permanent

7    resident status for their noncitizen spouse, the "beneficiary" of the petition.  *See* 8 U.S.C.

8    § 1154(a)(1)(A)(i).  If USCIS grants an I-130 petition, then the beneficiary is classified as an

9    "immediate relative" who may seek adjustment of status to permanent residence by filing an I-485

10   application.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i).  The Ninth Circuit has explained that the "grant of

11   an I-130 petition for immediate relative status is a nondiscretionary decision."  *Ching v. Mayorkas*,

12   725 F.3d 1149, 1156 (9th Cir. 2013).  "Immediate relative status for an alien spouse is a right to

13   which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the

14   statutory and regulatory requirements for eligibility."  *Id.*

15        "One bar to the grant of an I-130 petition is the so-called 'marriage fraud bar,' which

16   prohibits the grant of a petition if 'the alien has previously been accorded, or has sought to be

17   accorded, an immediate relative or preference status as the spouse of a citizen of the United

18   States . . . by reason of a marriage determined by the [Director of the Bureau of Citizenship and

19   Immigration Services] to have been entered into for the purpose of evading the immigration

20   laws.'"  *Yocom v. United States Citizenship & Immigr. Servs.*, No. 23-55430, 2024 WL 2206342,

21   at *2 (9th Cir. May 16, 2024) (quoting 8 U.S.C. § 1154(c)).  To apply this bar, the government

22   must "provide 'substantial and probative evidence' of marriage fraud."  *Id.* (quoting 8 C.F.R.

23   § 204.2(a)(1)(ii)); *see also Zerezghi v. USCIS*, 955 F.3d 802, 805 (9th Cir. 2020).  The

24   "substantial-and-probative-evidence standard is a standard of proof, which is at least as high as a

25   preponderance of the evidence."  *Zerezghi*, 955 F.3d at 816.  "The burden then shifts to the

26   petitioner to rebut that finding."  *Id.*

27   //

28   //

6

### C.     Procedural History

Plaintiffs filed a complaint in February 2024, claiming that in denying the I-130 petition Defendants acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA") and the Due Process Clause of the U.S. Constitution.  Dkt. No. 1.  They then filed an amended complaint in May 2024.  Dkt. No 15.  The amended complaint alleges that Plaintiffs' due process rights were violated because the witnesses, including Mr. Caldera Rodriguez, Ms. Trejo, Ms. Munoz, and Mr. Rojas, were not made available for cross-examination in an evidentiary hearing.  *See id.* at ¶¶ 58–67.  As such, Plaintiffs urge that the denial of the I-130 visa petition was not supported by substantial and probative evidence that Givovich and Mr. Caldera Rodriguez entered into a fraudulent marriage.  *See id.* at ¶¶ 68–77.  Plaintiffs also argue that the corresponding denial of the I-485 application was similarly erroneous and in violation of the APA.  *See id.* at ¶¶ 79–82.  The parties then filed cross-motions for summary judgment.  *See* Dkt. Nos. 20, 22.

## II.     LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

Summary judgment is the appropriate mechanism to review agency determinations under the APA because the Court's review is limited to the administrative record and it is not resolving

United States District Court
Northern District of California

United States District Court
Northern District of California

1   questions of disputed fact.  *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–

2   72 (9th Cir. 1994).  Under the APA, the Court "must set aside the BIA's decision if it is 'arbitrary,

3   capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Zerezghi*, 955 F.3d

4   at 807 (quoting 5 U.S.C. § 706(2)(A)).  The Court reviews the agency's legal determinations de

5   novo and its factual findings for substantial evidence.  *See Meza-Vallejos v. Holder*, 669 F.3d 920,

6   924 (9th Cir. 2012); *Zerezghi*, 955 F.3d at 814–15.

7   **III.    DISCUSSION**

8   **A.    Due Process**

9       Plaintiffs argue that their due process rights were violated because they did not have the

10  opportunity to cross-examine the witnesses on whose statements Defendants and the BIA relied to

11  deny the I-130 petition.  *See* Dkt. No. 20 at 15.[3]

12      The Due Process Clause of the Fifth Amendment provides that no person shall "be

13  deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The

14  Ninth Circuit has explained that "[a] threshold requirement to a substantive or procedural due

15  process claim is the plaintiff's showing of a liberty or property interest protected by the

16  Constitution."  *Ching*, 725 F.3d at 1155 (quotation omitted).  "To have a property interest in a

17  benefit," a person must "have a legitimate claim of entitlement to it."  *Id.* (quotation omitted).

18  This is "determined largely by the language of the statute and the extent to which the entitlement

19  is couched in mandatory terms."  *Id.* (quotation omitted).

20      In *Ching*, the Ninth Circuit held that because the "grant of an I–130 petition for immediate

21  relative status is a nondiscretionary decision," it is a protected interest that "is entitled to the

22  protections of due process."  *Id.* at 1156 ("Immediate relative status for an alien spouse is a right to

23  which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the

24  statutory and regulatory requirements for eligibility.").  The Ninth Circuit thus reversed a grant of

25  summary judgment where the petitioners were not afforded the opportunity to cross-examine

26  noncitizen Teresita Ching's ex-husband or the USCIS officer who took the ex-husband's

27  _____

28  [3] When citing to the parties' briefs, the Court refers to the PDF pages rather than the document's
    internal pagination unless otherwise noted.

statement. *Id.* at 1154–55.  USCIS based its marriage fraud determination solely on a six-sentence statement from the ex-husband, in which he said that he did not marry for love, was paid in cash installments, and never lived with or had sex with Ching.  *Id.* at 1153.  Ching, on the other hand, submitted a lengthy sworn declaration in which she described "in excruciating detail her intimate relationship" with her ex-husband.  *Id.*  She also corroborated the account of her relationship with "photographs of the couple, joint utility bills, an apartment lease, and a letter [her ex-husband] had previously written to USCIS stating that he and Ching 'truly loved each other.'"  *Id.*  The Ninth Circuit held that under such circumstances, "due process required a hearing with an opportunity for Ching to confront the witnesses against her."  *Id.* at 1159.

Plaintiffs urge that due process similarly required them to be given the opportunity to cross-examine Mr. Caldera Rodriguez, Ms. Trejo, Ms. Munoz, and Mr. Rojas.  *See* Dkt. No. 20 at 15–17.  Plaintiffs appear to characterize *Ching* as categorically holding that due process *always* requires an opportunity to cross-examine witnesses when assessing I-130 petitions.  *See id.* at 15 (arguing that *Ching* held that an I-130 petitioner's procedural due process right "includes the right to cross examination").  However, in *Ching*, the Ninth Circuit emphasized that "due process is flexible and calls for such procedural protections as the particular situation demands."  *Ching*, 725 F.3d at 1157 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).  The court noted that this is especially true in administrative proceedings, which require consideration of "the specific circumstances involved . . . on a case by case basis."  *Id.*[4]

Accordingly, to determine whether Plaintiffs are due the additional process of an evidentiary hearing to cross-examine the witnesses, the Court must consider the three *Mathews* factors:

---

[4] Plaintiffs cite *Gavrilescu v. U.S. Dep't of Homeland Sec.*, No. 23-55036, 2024 WL 2862127 (9th Cir. June 6, 2024), an unpublished memorandum disposition in which the Ninth Circuit "fault[ed] the agency for failing to inform applicants of their right under *Ching* and to provide a mechanism to implement that right."  *Id.* at 1.  But there, the court focused on the agency's failure to notify the petitioners of the potential availability of a *Ching* hearing where petitioners did not request one.  *See id.*  Here, Plaintiffs requested an opportunity to cross-examine the witnesses multiple times.  *See, e.g.*, CAR3 at 361.  And ultimately, the *Gavrilescu* court found that substantial evidence supported the denial of appellants' I-130 petition.  *Gavrilescu*, 2024 WL 2862127, at *20.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

6     *Mathews*, 424 U.S. at 335.

7          **i.     Prejudice**

8          As an initial matter, Defendants argue that Plaintiffs must show prejudice as a predicate to

9     alleging a due process violation, and that they are unable to do so.  Dkt. No. 22 at 19.  In *Ching*,

10    the Ninth Circuit noted that "[t]he question of whether a plaintiff must demonstrate prejudice in

11    the context of an I–130 visa petition is not settled." *Ching*, 725 F.3d at 1156.  The Ninth Circuit

12    declined to decide the issue definitively because the petitioners there had demonstrated sufficient

13    prejudice. *Id.*  The court noted that "prejudice is shown if the violation *potentially* affects the

14    outcome of the proceedings." *Id.* at 1156–57 (emphasis in original).  The court found it sufficient

15    that USCIS accepted the ex-husband's statement as true without the opportunity for cross-

16    examination, and "in the face of contradictory documents and affidavits." *Id.* at 1156.  The court

17    cautioned that the right to cross-examine witnesses is particularly important "where the evidence

18    consists of the testimony of individuals whose memory might be faulty or who, in fact, might be

19    perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.*

20    (quotation omitted).

21         Here, Defendants acknowledge that the Ninth Circuit declined to answer this question in

22    *Ching*. *See* Dkt. No. 22 at 18.  Nonetheless, they contend that "if prejudice is required for

23    plaintiffs raising due process challenges to removal proceedings, a similar threshold should be

24    required for due process claims in visa petition cases." *Id.* at 18, n.5.  They cite to *Padilla v.*

25    *Ashcroft*, 334 F.3d 921, 924 (9th Cir. 2003), with a parenthetical describing that the case

26    "requir[ed] prejudice as [a] prerequisite for petitioner's due process claim, which challenged her

27    expedited removal proceedings," but provide no further analysis of the issue. *See id.*  The Court

28    finds this cursory argument unpersuasive, and the Court should not have to fill in the gaps for

Defendants.  Moreover, to the extent the parties assume that Plaintiffs must show prejudice, their

arguments turn on the nature of the other evidence in the record, including the credibility of the

declarants and the strength of Plaintiffs' rebuttal evidence, and whether Plaintiffs should have

been able to cross-examine the declarants.  *Compare* Dkt. No. 22 at 18–19 and Dkt. No. 24 at 7–8,

*with* Dkt. No. 23 at 9–11.  The Court addresses these issues more directly in the sections below,

and accordingly declines to decide whether Plaintiffs must show prejudice as a predicate to

alleging a due process violation.

### ii.  *Mathews* Factors

#### a.  First Factor

In evaluating the *Mathews* factors, the Court first considers the private interests that are at

stake in adjudicating the I-130 without providing Plaintiffs an opportunity to cross-examine

witnesses.  *See Ching*, 725 F.3d at 1157 ("The first *Mathews* factor is an assessment of the private

interest that will be affected by the official action").  In *Ching*, the Ninth Circuit reasoned that this

factor favored the plaintiffs because (1) Ching faced removal from the United States without the I-

130 approval; (2) "[t]he right to marry and to enjoy marriage are unquestionably liberty interests

protected by the Due Process Clause"; and (3) "[t]he right to live with and not be separated from

one's immediate family is a right that ranks high among the interests of the individual and that

cannot be taken away without procedural due process."  *Id.* (quotation omitted); *accord Zerezghi*,

955 F.3d at 810 (relying on *Ching*'s analysis to define the private interests at stake).  In a similar

case involving an I-130 petition, the Ninth Circuit explained that "being separated from one's

spouse implicates strong private interests" under the first *Mathews* factor.  *Yocom*, 2024 WL

2206342, at *2.

Plaintiff initially argues simply that "the private interest affected by the government's

action favors the couple that filed an I-130 petition."  Dkt. No. 20 at 17 (citing *Zerezghi*, 955 F.3d

at 810).  Defendants counter that the Supreme Court's decision in *Department of State v. Muñoz*,

144 S. Ct. 1812 (2024), undermines the significance of the private interest presumed in *Ching*.

*See* Dkt. No. 22 at 22.  In *Muñoz*, Sandra Muñoz, a U.S. citizen, filed an I-130 petition for her

husband, which was granted.  *Id.* at 1818.  Because her husband had entered the United States

11

unlawfully, he was required to return to El Salvador and submit his visa application at a consulate there. *Id.* The consular officer ultimately denied the husband's visa application without explanation after finding that he was associated with the transnational gang MS-13. *Id.* at 1817. Her husband could not challenge the denial of his visa application, so Muñoz challenged it instead. *Id.* In doing so, she urged that "[t]he right to live with her noncitizen spouse in the United States is implicit in the 'liberty' protected by the Fifth Amendment," and that "the denial of her husband's visa deprived her of this interest, thereby triggering her right to due process." *Id.* She further argued that the consular officer had violated her right to due process by declining to disclose the reason for finding her husband inadmissible. *Id.*

In reversing the Ninth Circuit, the Supreme Court held "that a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country." *Id.* at 1821. The Court recognized that "Congress can use its authority over immigration to prioritize the unity of the immigrant family," and it does so by, for example, exempting "immediate relatives" from certain numerical quotas. *Id.* at 1825. But the Supreme Court explained that "the Constitution does not *require* this result." *Id.* (emphasis in original). The Court further explained:

> Congress's generosity with respect to spousal immigration has always been subject to restrictions, including bars on admissibility. This is an area in which more than family unity is at play: Other issues, including national security and foreign policy, matter too. Thus, while Congress may show special solicitude to noncitizen spouses, such solicitude is a matter of legislative grace rather than fundamental right.

*Id.* (quotation omitted). According to Defendants, in light of *Muñoz*, the Court may no longer afford significance to the interests articulated in *Ching*, including Plaintiff Martinez Olivera's rights to marry Plaintiff Givovich, to enjoy their marriage, and to live together in the United States. *See* Dkt. No. 24 at 9. Instead, "the relevant private interest in this case for purposes of the first Mathews factor is no more than Plaintiff Martinez Olivera's desire to live with his spouse in the United States, which," under *Muñoz*, "is not a protected right and is not entitled to the heightened sensitivities presumed by the Ninth Circuit in *Ching*." *See id.*

Plaintiffs respond that although *Muñoz* "now mandates a finding that a United States

United States District Court
Northern District of California

citizen has no due process liberty interest in residing with their spouse in the United States, their due process property interest nevertheless remains due to the mandatory nature of the Form I-130 petition." Dkt. No. 23 at 8. Accordingly, Plaintiffs posit that as the U.S. citizen petitioner, Plaintiff Martinez Olivera still has a property interest that triggers procedural due process rights under *Ching*. *See id.* Defendants, however, do not contest that under *Ching*, Form I-130 petitioners have a property interest in their petitions. *See* Dkt. No. 24 at 8. More accurately, they argue that while *Ching* held that I-130 petitioners have a protected property interest, the court still relied significantly on a petitioner's liberty interests in the right to marriage and enjoyment of family life in assessing the first *Mathews* factor. *See id.* at 8–9. Defendants argue that these interests are no longer afforded heightened protections. *See id*. at 9 (citing *Muñoz*).

The Court acknowledges that in *Ching*, the Ninth Circuit held that the petitioners had a property interest in the approval of the I-130 petition because "[w]here a petitioner of an immediate relative petition proves that his marriage meets the requirements for the approval of an I–130, he is entitled, as a matter of right, to the approval of his petition." *Ching*, 725 F.3d at 1155. Although the Court relied in part on the "protected liberty interest" that a U.S. citizen has in her marriage to "buttress" this conclusion, the Court primarily looked to the language of 8 U.S.C. § 1154 itself. *Id.* Consequently, *Muñoz* does not necessarily overrule *Ching* directly. And Defendants do not argue that it does, contrary to Plaintiffs' claim that Defendants argue *Ching* is "no longer good law." *See* Dkt. No. 23 at 6.

The Ninth Circuit has cautioned that only in cases of "clear irreconcilability" can district courts "consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). "This is a high standard," which "requires [the district court] to look at more than the surface conclusions of the competing authority." *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quotation omitted). Given the different procedural postures of *Ching* and *Muñoz*, the Court cannot say that the reasoning of *Ching* is clearly irreconcilable with *Muñoz*. Plaintiffs may have a property interest in the approval of an I-130 while lacking a liberty interest in residing in the United States together. The Court therefore

continues to conclude, as *Ching* found, that the grant of an I-130 petition is a "protected interest []

entitled to the protections of due process." *See Ching*, 725 F.3d at 1156; *see also Hanan v. U.S.

Citizenship & Immigr. Servs.*, No. 23-CV-02414-HSG, 2024 WL 4293917, at *12 (N.D. Cal. Sept.

25, 2024).

But this does not end the inquiry. The court in *Ching* went on to evaluate what if any

additional process petitioners were due as a result of this property right. *See id.* at 1157–59.

When evaluating the nature of the petitioners' private interest under the first *Mathews* factor, the

court explicitly considered the risk of family separation. *See Ching*, 725 F.3d at 1157 (noting that

"[t]he right to marry and to enjoy marriage are unquestionably liberty interests protected by the

Due Process Clause" and that "[t]he right to live with and not be separated from one's immediate

family is a right that ranks high among the interests of the individual and that cannot be taken

away without procedural due process"). As Defendants point out, *Muñoz* directly discussed these

rights, finding that a citizen does not have a fundamental liberty interest in residing with her

noncitizen spouse in the United States. *See Muñoz*, 144 S. Ct. at 1821. Consequently, it would

appear that *Muñoz* does lessen the significance of the private interests presumed in *Ching* under

the first *Mathews* factor.

Plaintiffs offer no response to this specific argument. Instead, they attempt to distinguish

*Muñoz* on the grounds that 1) it addressed a discretionary denial of a consular visa, which, unlike a

nondiscretionary I-130 petition, does not afford a property interest to the petitioner, and 2) the

petitioner in *Muñoz* was seeking to vindicate the procedural due process rights of her spouse,

rather than her own. *See* Dkt. No. 23 at 8. And here, Plaintiff Martinez Olivera is asserting his

own due process rights based on his property interest, not his spouse's. *See id.*

But these distinctions do not answer the fundamental question here, which is what

additional due process protections Plaintiff Martinez Olivera's property right in his petition

affords him in the adjudication of the petition. *See Ching*, 725 F.3d at 1157. ("Having concluded

that plaintiffs had a protected property interest and had established sufficient prejudice, we must

then determine whether additional process was due."). Plaintiffs provide no explanation of the

further significance of Plaintiff Martinez Olivera's property right in the approval of the I-130

petition.  Based on Plaintiffs' briefs, the Court understands its significance to be that it allows Plaintiffs to live together in the United States with their children.  *See* Dkt. 20 at 28 (describing Plaintiff Givovich as "a noncitizen who is married to a United States citizen with three United States citizen children who depend on her").  Given that Plaintiffs fail to identify any interests distinct from their desire to live together in the United States, the Court agrees with Defendants that in light of *Muñoz*, Plaintiffs' private interests are appropriately characterized as limited at best.  Accordingly, the first *Mathews* factor does not clearly weigh in favor of Plaintiffs.

### b.  Second Factor

The Court next considers the risk of an erroneous finding that Givovich's marriage with Mr. Caldera Rodriguez was fraudulent against the probative value of making Mr. Caldera Rodriguez and the other witnesses available for cross-examination.  *See Ching*, 725 F.3d at 1157–58.  The Ninth Circuit in *Ching* explained that "the risk of an erroneous finding that a prior marriage was fraudulent is high in cases where an ex-spouse is relied upon for evidence that the previous marriage was fraudulent."  *Id.*  An ex-spouse may, for example, be "motivated by malice, vindictiveness, intolerance, prejudice, or jealousy."  *Id.* at 1156 (quotation omitted).  Plaintiffs argue that these same risks exist here because Mr. Caldera Rodriguez was angered by Ms. Givovich's desire for a divorce, and that he lied about the true nature of his relationship with Givovich due to his simultaneous relationship with Ms. Trejo.  *See* Dkt. No. 20 at 18; Dkt. No. 23 at 14.  They also assert that Mr. Caldera Rodriguez "faced the threat of deportation if he did not agree to what immigration authorities wanted."  Dkt. No. 20 at 18.

Such general credibility concerns are likely present in every case in which the government relies on the statements of an ex-spouse.  But in *Ching*, the Ninth Circuit did not create a categorial rule that cross-examination is always required in such circumstances.  Instead, the Court stated that the amount of process anyone is entitled to depends on "the specific circumstances involved," and directed courts to evaluate such claims on a "case by case basis."  *Ching*, 725 F.3d at 1157.

In *Ching*, the court found that the risk of erroneous deprivation was "particularly high" because, in contrast to the ex-spouse's "terse statement" on which the BIA solely relied, *id.* at

1153, "the visa petitioner [had] substantial evidence that the first marriage was bona fide." *Id.* at

1158.  Specifically, the petitioner provided "excruciating detail" in a 21-page, single-spaced

document about their intimate relationship, the conversations they had, and why the relationship

eventually deteriorated.  *Id.* at 1153.  She also submitted numerous forms of corroborating

documentation contradicting the ex-spouse's statement.  *Id.* at 1153, 1158.  For example, the ex-

husband stated that they never lived together, but the petitioner provided a lease agreement and

joint utility bills.  *Id.* at 1153.  The ex-husband stated that he did not marry the petitioner for love,

but the petitioner proffered a letter her ex-husband had previously written to USCIS stating that he

and his ex-wife "truly loved each other."  *Id.*  The Ninth Circuit expressed concern that the BIA

was willing to reject such detailed evidence based solely on the ex-husband's conclusory say-so.

*See id.* at 1158.  The court thus concluded, "When there is such compelling evidence to rebut the

prior spouse's claim of marriage fraud, there is a high risk of erroneous deprivation when the

agency relies exclusively on written evidence."  *Id.*

Here, Plaintiffs argue that Defendants deprived them of due process because "[t]here is no

other evidence in the record of marriage fraud besides unsworn statements from declarants that

were not subject to cross examination."  *See* Dkt. No. 20 at 20.  Thus, according to Plaintiffs, the

lack of cross-examination "potentially affected the outcome of the proceeding" such that "the

reasoning in *Ching* clearly applies."  *Id.* at 19.  But nothing in *Ching* categorically bars the BIA

from relying on written statements alone to find substantial and probative evidence of marriage

fraud, and Plaintiffs submit no other controlling or persuasive authority to support their position.

Instead, *Ching* held that the risk of a due process violation posed by the government's exclusive

reliance on a written statement was high "[w]hen there [was] such compelling evidence to rebut

the prior spouse's claim of marriage fraud."  *Ching*, 725 F.3d at 1158.  And here, the Court agrees

with the BIA's conclusion that the risk of erroneous deprivation here was much lower than in

*Ching* based on the record evidence.  *See* CAR2 at 65.[5]

---

[5] Relatedly, Plaintiffs argue that Defendants should have produced the declarants for cross-
examination because reliance on their statements was "fundamentally unfair."  *See* Dkt. No. 16–
17.  However, the cases Plaintiffs cite addressed alleged due process violations in removal
proceedings, which statutorily require that an alien be given a reasonable opportunity to cross-

In *Ching*, the court found a high risk of erroneous deprivation because the agency solely relied on a very short and minimally detailed statement by the petitioner's ex-spouse, while summarily rejecting the petitioner's extensive rebuttal evidence that directly contradicted the ex-spouse's claims. *See Ching*, 725 F.3d at 1158. The facts of this case are markedly different. Defendants here relied on two statements from Mr. Caldera Rodriguez: his initial statement, and a longer, detailed statement corroborating and providing additional context for his contention that he agreed to marry Givovich as a favor to help her obtain immigration status. *See* CAR3 at 342–44; *id.* at 344–56. Further, they also relied on the statements of three other individuals who corroborated various aspects of Mr. Caldera Rodriguez's statements, providing additional proof of marriage fraud. *See id.* at 340, 357–59. Each of these individuals—Mr. Caldera Rodriguez's partner and the mother of his child, his landlord at the St. Helena address, and his landlord's live-in partner—was in a position to have personal knowledge of the relevant facts they corroborated, including when and with whom Mr. Caldera Rodriguez lived at the purported marital address.

In addition, Plaintiffs offered far less compelling rebuttal evidence than in *Ching*, despite having three opportunities to submit, and significant time to amass, such evidence. The Planned Parenthood document (signed only by Givovich) and the flirtatious messages between Givovich and Mr. Caldera Rodriguez do not contradict Mr. Caldera Rodriguez's statements or show a bona fide marriage, as they do not establish that the two ever had sex or had an ongoing sexual relationship during the marriage period. In addition, the bills and invoices Plaintiffs submitted are all addressed solely to Givovich, and thus lacked the same weight as the "joint" utility bills and apartment lease submitted in *Ching*. *Compare* CAR4 at 415 and 422 *with Ching*, 725 F.3d at 1153. Similarly, the three brief declarations from Plaintiffs' friends and family offer no genuinely probative insight into the nature of the relationship between Givovich and Mr. Caldera Rodriguez. *See, e.g.*, CAR4 at 443 (letter from Gene Tardiff reporting that he drove Givovich to the St.

_____

examine government witnesses. *See Cunanan v. I.N.S.*, 856 F.2d 1373, 1374 (9th Cir. 1988*)*; *Baliza v. I.N.S.*, 709 F.2d 1231, 1234 (9th Cir. 1983); 8 U.S.C. § 1252(b)(3). Plaintiffs do not compellingly explain why these cases are persuasive or applicable here, given that "the statutory protections provided in removal proceedings do not apply to adjudications of I–130 visa petitions." *See Ching*, 725 F.3d at 1154.

United States District Court
Northern District of California

1   Helena address, but acknowledging that never went inside the home, never met Mr. Caldera

2   Rodriguez, and never saw him at the address).

3           Finally, Plaintiffs have not shown that cross-examination of the witnesses would provide

4   the sort of substantial probative value that the *Ching* court found. *Ching*, 725 F.3d at 1158. In

5   *Ching*, the petitioner was "not informed of the circumstances under which [her ex-spouse] was

6   visited or his statement was taken." *Id.* The court thus concluded that cross-examination of the

7   ex-spouse would require him to elaborate about the basis for his contention that the marriage was

8   fraudulent and answer questions about the circumstances of his interview by USCIS. *See id.* But

9   here, Defendants informed Plaintiffs of the circumstances of Mr. Caldera Rodriguez's interviews

10  and obtained a follow-up statement from him elaborating in significant detail on the claims he

11  made in his first statement. *See* CAR3 at 331, 333.[6] Defendants also gave Plaintiffs notice of the

12  circumstances of the other witness interviews and the substance of their statements. *See id.* at

13  333–34. Plaintiffs nonetheless failed to submit any rebuttal evidence beyond their own

14  declarations that contradicted the statements or established a bona fide marriage, despite multiple

15  opportunities to do so. The Court therefore agrees with the BIA's conclusion that cross-examining

16  Mr. Caldera Rodriguez and the other declarants would have provided little added probative value.

17  *Cf. Zerezghi v. United States Citizenship & Immigr. Servs.*, 955 F.3d 802, 813 (9th Cir. 2020)

18  (petitioner should have been given opportunity to rebut strongest piece of derogatory evidence

19  where the government had not shared it, and where "rest of the record [was] equivocal" in

20  showing bona fide marriage).

21          In sum, Defendants here obtained a detailed statement from the ex-spouse, interviewed

22  multiple corroborating witnesses, and reasonably concluded that Plaintiffs' rebuttal evidence was

23  minimal and not compelling. *See* CAR2 126–143. Additionally, Plaintiffs had notice of the

24  contents of the derogatory statements, and had ample time and numerous opportunities to submit

25

26  _____

[6] Plaintiffs state that on cross-examination they would inquire into potential "coercion" of Mr.
27  Caldera Rodriguez during his interviews with Defendants because he is not a United States citizen.
    *See* Dkt. No. 20 at 18. But unlike in *Ching*, there is nothing in the record here to support this
28  assertion, beyond the bare fact of Mr. Caldera Rodriguez's status as a lawful permanent resident
    rather than a U.S. citizen.

United States District Court
Northern District of California

rebuttal evidence.  Accordingly, the Court finds that the BIA's reliance on the written witness statements did not pose a significant risk that Plaintiffs were erroneously deprived of their rights. The second *Mathews* factor therefore does not weigh in favor of finding that Plaintiffs had a due process right to cross-examine the government's witnesses.

### c. Third Factor

Lastly, the Court considers the government's interest.  The Ninth Circuit has stated that "the government has a substantial interest in preventing marriage fraud and in avoiding erroneously providing benefits." *Ching*, 725 F.3d at 1158.  "On the other hand, there is a significant public interest in allowing those who are legitimately married to receive the benefits intended for them." *Id.* at 1158–59.  The Court must therefore consider the burden on the government in holding a hearing at which Plaintiffs could cross-examine Mr. Caldera Rodriguez, Ms. Trejo, Ms. Munoz, and Mr. Rojas.  Defendants allude generally to the financial and administrative burden that this would impose on the government.  *See* Dkt. No. 22 at 26.  They emphasize the fact that Plaintiffs sought to cross-examine multiple witnesses, but still offer little detail about the true cost of providing such additional process.  *See id.*  In the absence of more specific information, the Court finds that the burden of holding an evidentiary hearing and making the declarants available for cross-examination would be slight.[7]

\*        \*        \*

Having considered the parties' arguments in detail, the first two *Mathews* factors weigh against finding that Plaintiffs had a due process right to cross-examine Mr. Caldera Rodriguez and the other witnesses.  And only the third factor weighs in favor of Plaintiffs in this case.  On

---

[7] To argue that an evidentiary hearing to cross-examine the witnesses would not be burdensome, Plaintiffs note the court's finding in *Ching* that the burden of a hearing on the government was low because removal proceedings, which had been initiated against the plaintiff, already guaranteed such process.  *Ching*, 725 F.3d at 1158.  Plaintiffs seem to suggest that even though removal proceedings have not been initiated against Plaintiff Givovich, "removal hearings are in fact required if the government wishes to rely on hearsay statements so that the parties have the availability of cross-examination." Dkt. No. 23 at 15, n.6.  The Court declines to address this cursory argument that was only raised in reply to the government's brief and not in Plaintiffs' complaint or motion for summary judgment.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (internal citation omitted).

United States District Court
Northern District of California

balance, the Court therefore finds that Plaintiffs did not have a due process right to cross-examine Mr. Caldera Rodriguez and the three other declarants under the circumstances.

### B. Substantial Evidence

Aside from their due process concerns, Plaintiffs argue that the BIA's determination that Givovich and Caldera Rodriguez's marriage was fraudulent so as to trigger the marriage fraud bar was not supported by substantial and probative evidence. *See* Dkt. No. 20 at 15–23. The Court reviews Defendants' determination that the marriage was fraudulent under the substantial evidence standard.[8] *See Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004) ("Whether [a beneficiary] entered into the qualifying marriage in good faith is an intrinsically fact-specific question reviewed under the substantial evidence standard."). Substantial evidence "is an extremely lenient standard that asks courts to consider only whether the administrative record contains sufficient evidence to support the agency's factual determinations." *Zerezghi*, 955 F.3d at 814 (quotations and alterations omitted). "In the immigration context, the substantial-evidence standard means that a reviewing court must affirm the BIA's order when there is such relevant evidence as reasonable minds might accept as adequate to support it, even if it is possible to reach a contrary result on the basis of the evidence." *Id.* at 814–15 (quotation omitted).

As explained above, Defendants relied on the statements of Mr. Caldera Rodriguez, Ms. Trejo, Ms. Munoz, and Mr. Rojas, as well as Plaintiffs' failure to present rebuttal evidence establishing a shared life during Plaintiff Givovich's marriage to Mr. Caldera Rodriguez. CAR2 at 63. Plaintiffs offer various critiques of these findings.

First, Plaintiffs reiterate their argument that a "sworn statement without more" is insufficient to invoke § 1154(c). *See* Dkt. No. 23 at 16. However, as discussed above, Plaintiffs provide no authority for this assertion.

Second, Plaintiffs argue that Defendants' approval of Mr. Caldera Rodriguez's petition for

---

[8] The government must prove marriage fraud by "substantial and probative evidence," a standard that is "at least as high as a preponderance of the evidence." *See* 8 C.F.R. § 204.2(a)(1)(ii); *Zerezghi*, 955 F.3d at 816. Once the government has found substantial and probative evidence of marriage fraud, the burden then shifts to the petitioners to rebut that finding. *See Zerezghi*, 955 F.3d at 805. This standard of *proof* is distinct from the Court's standard of *review*. *Id.* at 813–16.

United States District Court
Northern District of California

1    Plaintiff Givovich supports the conclusion that their marriage was bona fide.  *See* Dkt. No. 20 at

2    17; *see also* Dkt. No. 23 at 16.  This argument is without merit.  If there is "no affirmative finding

3    that the marriage was entered into for the purpose of evading the immigration laws" with respect

4    to the first petition, the resolution of the current petition depends on "whether there is, at present,

5    sufficient evidence" of marriage fraud, "inclusive of evidence relied upon in the determination of

6    the first visa petition." *Matter of Tawfik*, 20 I. & N. Dec. 166, 168–69 (BIA 1990).  Here,

7    Plaintiffs point to no evidence related to the first petition that establishes a bona fide marriage or

8    undermines the evidence of marriage fraud presented in connection with the second petition.[9]

9         Plaintiffs next argue that the statements by Mr. Caldera Rodriguez are not substantial and

10   probative evidence of marriage fraud because they were contradicted by Plaintiffs' submissions.

11   Again, Plaintiffs focus on the suggestive messages Mr. Caldera Rodriguez sent to Plaintiff

12   Givovich, such as his statements "where he says 'take care and kisses, I hope to see you soon.'"

13   *See* Dkt. No. 20 at 23.  They argue that the BIA improperly discounted these messages "show[ing]

14   a romantic relationship," which they contend contradict Mr. Caldera Rodriguez's statement that he

15   and Givovich did not have sex.  *See id.*  But it is not for the Court to reweigh the evidence and

16   substitute its opinions and credibility determinations for those of the agency.  "The agency's

17   findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude

18   to the contrary." *Iman v. Barr*, 972 F.3d 1058, 1064 (9th Cir. 2020).  The BIA's determination

19   that the messages should be afforded limited weight because they mostly did not occur during the

20   marriage, did not evidence a shared marital life, and did not actually reflect any sexual contact

21   contradicting Mr. Caldera Rodriguez's statements was not unreasonable.  *See* CAR2 at 64.

22        Plaintiffs similarly contend that the statements of the other three declarants were not

23   substantial and probative evidence of marriage fraud.  *See* Dkt. No. 20 at 23–24.  The BIA found

24   that the statements corroborated Mr. Caldera Rodriguez's statements for several reasons.  Ms.

---

[9] The case Plaintiffs cite, *Chaparro Navarro v. United States Dep't of Homeland Sec.*, 612 F. Supp. 3d 986 (N.D. Cal. 2020), is inapplicable to the facts here.  That case concerned the revocation of a visa where USCIS offered "no reason or argument" for their revocation decision. *Id.* at 1004.  But here, Defendants are not revoking or contradicting a prior finding of a bona fide marriage, and have also articulated a sufficient rationale for applying the marriage fraud bar based on the evidence.

United States District Court
Northern District of California

1    Trejo stated that she stayed with Mr. Caldera Rodriguez as his girlfriend during the marriage to

2    Givovich, and at their purported shared home, but never saw evidence of a woman living there.

3    *See* CAR2 at 63.  Ms. Munoz confirmed that she rented the space to Mr. Caldera Rodriguez and a

4    male roommate, and stated that Plaintiff Givovich used the address only to receive mail.  *See id.*

5    Mr. Rojas said that he lived at the property and never recalled a woman living there.  *See id.*  It

6    was not unreasonable for the BIA to conclude that these statements all corroborated Mr. Caldera

7    Rodriguez's statements that he never lived with Givovich at the St. Helena address and that he was

8    dating Ms. Trejo during the marriage.

9        Finally, Plaintiffs argue that the BIA failed to give proper weight to the rebuttal evidence

10   they submitted, but the Court finds that none of the evidence compels the Court to disturb the

11   BIA's assessment.  *See Iman*, 972 F.3d at 1064.  First, Plaintiffs repeat their assertion that the

12   messages between Givovich and Caldera Rodriguez, along with the Planned Parenthood form,

13   establish that the two had a sexual relationship and a shared address.  *Id.* at 25.  But the BIA's

14   conclusion to the contrary was plausible given the limited probative value of the messages based

15   on their timing and content, and the fact that the form was completed only by Plaintiff Givovich.

16   CAR2 at 64.  Second, Plaintiffs argue that the BIA "discounted" the insurance policy and bank

17   statements Plaintiffs submitted that "confirm Plaintiff Givovich was living at the Oak Avenue

18   address in St. Helena, CA."  Dkt. No. 20 at 26.  But the BIA's decision to afford little probative

19   value to these documents because they were addressed only to Plaintiff and failed to show any

20   shared property or commingling of assets also was not unreasonable.  *See* CAR2 at 64.

21       Third, Plaintiffs assert that the BIA arbitrarily discounted the three letters that they argue

22   evidenced a legitimate marriage.  *See* Dkt. No. 20 at 27–28.  Specifically, Plaintiffs allege that the

23   BIA arbitrarily discounted the letters because they were "unsworn," yet gave significant weight to

24   the unsworn statements of the declarants Defendants interviewed.  *Id.* at 27.  Defendants counter

25   that "the weight the BIA gave these statements relates to the content of the statements, not whether

26   the witnesses were sworn or under oath."  Dkt. No. 24 at 17.  The Court agrees, and finds that it

27   was not unreasonable for the BIA to determine that the statements in the letters lacked probative

28   details about the relationship sufficient to evidence a legitimate marriage.  Gene Tardiff's letter

United States District Court
Northern District of California

stated that while he drove Givovich to the St. Helena address, he never went into the home, never met Mr. Caldera Rodriguez or saw him at the address, and could not confirm that Ms. Munoz knew that Plaintiff Givovich lived there. *See* CAR4 at 443. Similarly, the letter from Jaime Godinez, a friend of Mr. Caldera Rodriguez, states that he "knew that [Givovich and Mr. Caldera Rodriguez] were married and lived together at the residence they rented in St. Helena." CAR3 at 310. But Mr. Godinez does not provide any basis for this belief other than that he "on many occasions visited them while [he was] living in St. Helena," which does not confirm that he actually visited them at the St. Helena address. *See id.* Finally, Plaintiff Givovich's father states that he was "aware of the marriage," but similarly does not include any detail about how or why he knew the marriage was legitimate. *Id.* at 12. And the BIA's failure to specifically mention this letter was not arbitrary and capricious, especially given the limited probative value of the letter. *See Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) (BIA is not required to "discuss each piece of evidence submitted . . . when nothing in the record or the BIA's decision indicates a failure to consider all the evidence").

The Court thus finds that Defendants reasonably concluded that Plaintiffs' evidence did not overcome Mr. Caldera Rodriguez's statements, corroborated by the other declarants, that he and Plaintiff Givovich entered into the marriage so that she could receive immigration benefits. Accordingly, the Court finds that Defendants' application of the marriage-fraud bar was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

//

//

//

//

//

1

United States District Court
Northern District of California

## IV.     MOTION TO SEAL

### A.     Legal Standard

Courts generally apply a "compelling reasons" standard when considering motions to seal documents. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). "This standard derives from the common law right 'to inspect and copy public records and documents, including judicial records and documents.'" *Id.* (quoting *Kamakana*, 447 F.3d at 1178). "[A] strong presumption in favor of access is the starting point." *Kamakana*, 447 F.3d at 1178 (quotations omitted). To overcome this strong presumption, the party seeking to seal a judicial record attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events." *Id.* at 1178–79 (quotations omitted). "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

The Court must "balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* Civil Local Rule 79-5 supplements the compelling reasons standard set forth in *Kamakana*: the party seeking to file a document or portions of it under seal "must explore all reasonable alternatives to filing documents under seal, minimize the number of documents filed under seal, and avoid wherever possible sealing entire documents . . . ." Civil L.R. 79-5(a). The party must further explain the interests that warrant sealing, the injury that will result if sealing is declined, and why a less restrictive

alternative to sealing is not sufficient. *See* Civil L.R. 79-5(c).

Records attached to nondispositive motions must meet the lower "good cause" standard of Rule 26(c) of the Federal Rules of Civil Procedure, as such records "are often unrelated, or only tangentially related, to the underlying cause of action." *See Kamakana*, 447 F.3d at 1179–80 (quotations omitted). This requires a "particularized showing" that "specific prejudice or harm will result" if the information is disclosed. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002); *see also* Fed. R. Civ. P. 26(c). "Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning" will not suffice. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotation omitted).

## B.    Discussion

The parties have jointly sought to file under seal the certified administrative record in this case in its entirety. *See* Dkt. No. 19 at 1. Because these records are more than tangentially related to the underlying action, the Court applies the "compelling reasons" standard.

The parties state that the administrative record contains "third party confidential information that is protected from public disclosure by the Privacy Act of 1974, 5 U.S.C. § 552a," as well as "sensitive personal and financial information." Dkt. No. 19-1 at ¶ 3. Having reviewed the administrative record in detail, however, it is not apparent why it needs to be sealed in its entirety. Although the record contains some personally identifying information and third party information, the parties have not explained why such information cannot be redacted in part. On the other hand, the record contains information that is critical to understanding this case, including the USCIS and BIA's decisions and Plaintiffs' responses. The Court further notes that the parties quote heavily from these documents, so it is clear that the parties do not believe that *everything* in the record warrants sealing. The parties have failed to meet their burden of establishing that compelling reasons require the certified administrative record to be sealed in its entirety, and the Court therefore **DENIES** the motion. Dkt. No. 19.

## V.    CONCLUSION

Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment, Dkt. No. 20,

and **GRANTS** Defendants' cross-motion, Dkt. No. 22.  The Court further **DENIES** the motion to

seal.  Dkt. No. 19.  The Court **DIRECTS** the parties to file public versions of all documents

previously filed under seal or file a new, more narrowed motion to seal, within 10 days of this

order.  Any renewed motion to seal must be targeted to seal only the specific, identified portions

of the administrative record that truly meet the standard for sealing, and that have not already been

disclosed to the public.  The Clerk is directed to enter judgment in favor of Defendants and close

the case.

**IT IS SO ORDERED.**

Dated:    3/25/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge